Tomás De Jesús MANGUAL, Plaintiff, Appellant, Jorge Medina; Caribbean International News Corporation, Movants, Appellants,

v.

Angel E. ROTGER–SABAT, Secretary of Justice of the Commonwealth of Puerto Rico; John Doe, Defendants, Appellees.

No. 02–1669.

United States Court of Appeals, First Circuit.

Heard Oct. 15, 2002.

Decided Jan. 21, 2003.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 12, 2003.

Juan R. Marchand Quintero on brief for Appellants.

Roberto J. Sánchez Ramos and Camelia Fernández Romeu, Office of the Solicitor General of the Commonwealth of Puerto Rico, on brief for Appellees.

Before LYNCH and HOWARD, Circuit Judges, and SHADUR, Senior District Judge.*

LYNCH, Circuit Judge.

A newspaper reporter threatened with prosecution for articles he had published about government corruption brought suit in 1999 challenging the Puerto Rico criminal libel statute as unconstitutional under the First Amendment. Three other reporters, including one who had been prosecuted under the statute and another who had been threatened, sought to intervene on the plaintiff's side, along with a newspaper and the Overseas Press Club. The plaintiff sought declaratory and injunctive relief and at the outset moved for sum-

* Of the Northern District of Illinois, sitting by designation.

mary judgment on the ground that the statute is plainly unconstitutional. The district court dismissed the suit in 2002, finding no jurisdiction due to standing, ripeness and mootness concerns. We hold that the district court was in error as to its standing, ripeness and mootness rulings and that the criminal libel statute is unconstitutional as applicable to statements regarding public officials and public figures.

## I. Factual Background

In 1974, Puerto Rico enacted a criminal defamation statute, in articles 118 to 121 of the Penal Code. 33 P.R. Laws Ann. §§ 4101–4104 (2001). The full text of the statute, as officially translated, reads:

§ 4101. Libel

Any person who maliciously, by any means, or in any way, publicly dishonors or discredits, or charges the commission of an act constituting a crime, or impugns the honesty, integrity, virtue or reputation of any natural or juridical person, or who blackens the memory of one who is dead, shall be punished with a term of imprisonment of not more than six (6) months, a fine of not more than five hundred dollars ($500), the penalty of restitution, or any combination of these, at the discretion of the court. However, the court may impose the penalty of rendering community service in lieu of the term of imprisonment.[1]

§ 4102. Truth as defense

In all criminal prosecutions for libel, the truth shall constitute a defense and the accused shall be acquitted, provided it is proven that the charge made is true and he had good intention and justifiable ends.

If the victim is a public officer and the charge made refers to the performance of his duties, or if what was related or published refers to matter of public interest, the accused shall be acquitted whenever it is proven that the charge made is true; Provided, That if the charge made is false, said accused shall not be acquitted, if it is proven that he acted knowing the fact to be false and with gross and obstinate contempt of the truth.

§ 4103. Report of official acts

No report or statement, which is true and fair, of any judicial or legislative act, or of any other official character, nor of statements, arguments and debates had [contained] therein shall be considered to be libelous.

§ 4104. Diffusion of conviction

The trial court shall order the diffusion of the conviction through the same means used by the offender or through any other analogous or similar nature, and at the latter's expense.

*Id.*

The Puerto Rico newspaper *El Vocero de Puerto Rico* ("*El Vocero*") is published by Caribbean International News Corporation ("Caribbean"). In 1995, Caribbean created an internal division of *El Vocero*, the Editorial Investigations Division, which was designed to investigate matters of public concern, such as police brutality, government corruption, and the like. Obed Betancourt, a reporter for *El Vocero* since 1995, was transferred to this division in June 1998 and assigned to investigate allegations that the Narcotics Squad of the Caguas police had been infiltrated by organized crime. Betancourt wrote a series of articles reporting on these allegations, in-

---

**1.** This translation does not include a December 10, 1999 amendment to section 4101; that amendment increased the criminal penalty to incarceration between one and three years and a fine of not more than five thousand dollars, but made no other changes to the statute.

cluding evidence that a drug dealer who was targeted by the Narcotics Squad helped to organize its Christmas party and was paying bribes to officers.

Of particular importance for our purposes is Betancourt's article published on August 18, 1998. This article reported the allegation, made during an internal police administrative hearing, that Officer Elsa Rivera Colón, an agent with the Narcotics Squad, was having an affair with that same drug dealer. The purpose of publishing this information, according to Betancourt, was to explain why so many drug cases in Caguas were dismissed—because the Narcotics agents did not appear to testify—and how confidential information was leaked to investigation targets. The article also touched on Officer Rivera's fitness for police duty.

On September 10, 1998, Officer Rivera filed a civil action for libel against both Betancourt and *El Vocero*. On February 26, 1999, she also filed a complaint with the Caguas police against Betancourt for criminal libel under section 4101 and later urged the local district attorney to bring charges against Betancourt. Subsequently, she persuaded a fellow Caguas police officer to file a similar complaint and to secure his supervisor's signature on it. The case was then transferred to San Juan, where the newspaper's offices are located.

■ Betancourt and *El Vocero* filed suit in federal court, requesting declaratory judgment that the criminal libel statute is unconstitutional under the First Amendment.[2] Betancourt averred that he has refrained from further investigating political corruption for fear of being prosecuted again. On August 4, 1999, a federal dis-

trict judge issued an order prohibiting the prosecution of the charges against Betancourt while the declaratory judgment motion was before the court. In violation of that federal order, a police officer in San Juan brought the criminal libel charge against Betancourt on August 12, 1999; thus, four police officers in two departments were involved in initiating prosecutions. That same day Betancourt was forced to appear and testify at a probable cause hearing. The prosecution made no effort to put on evidence as to falsehood or reckless disregard for the truth. Cross-examination demonstrated that neither prosecution witness could establish anything about the truthfulness of the articles. The Puerto Rico court judge found no probable cause, and the criminal case was dismissed against Betancourt. Thereafter, the federal district court dismissed the federal declaratory judgment case as moot. *El Vocero v. Fuentes Agostini*, No. 99–1272 (D.P.R. Sept. 14, 1999).

Tomás de Jesús Mangual, the plaintiff in this case, is another reporter for *El Vocero* and was assigned to cover the Caguas police and courts. For over thirteen years he has written extensively on the subject of the corruption of government officials in the Caguas region, often identifying individual officials as corrupt and under the influence of drug traffickers. Mangual investigated the criminal libel complaint against Betancourt and wrote four articles on the subject between March 11 and 16, 1999. In these articles, Mangual accused the Caguas police, including Rivera, of being corrupt and of pursuing the libel charge against Betancourt in an attempt to silence him.

Mangual also made several accusations specifically against Officer Rivera, in addi-

---

**2.** The residents of Puerto Rico are protected by the First Amendment. *Torres v. Puerto Rico*, 442 U.S. 465, 469, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979) (citing *Balzac v. Porto Rico*, 258 U.S. 298, 314, 42 S.Ct. 343, 66 L.Ed. 627 (1922)).

tion to the charge that she had trumped up criminal charges against Betancourt in retaliation for his 1998 articles. The first was that Rivera was linked to drug traffickers, the same charge earlier made by Betancourt, and that she was under investigation as a result. The second was that Rivera had been conducting an adulterous affair with her married superior and had given birth to his child. This latter allegation was meant to explain Rivera's influence over the Caguas police. The articles asserted that she had managed to achieve a transfer to the drug unit in violation of normal procedures and had used her position to retaliate against officers who complained about her. Mangual wrote that the chief of the anti-corruption unit of the Puerto Rico police had instituted an investigation into a number of complaints against Rivera, and it was possible that probable cause to charge her would be found.

Officer Rivera responded to these articles by writing a letter to the Secretary of Justice on April 12, 1999. The letter notified Fuentes that "I am prepared not only to file the criminal charges that concern [Betancourt and Mangual], but also to bring this suit on its merits, up to the ultimate legal consequences." [3] This reference was to the filing of criminal libel charges against the two reporters. She complained of procedural anomalies in the handling of her prior criminal libel complaint against Betancourt, including the transfer of the case to San Juan, and requested an investigation "so that summons be issued for this case for the corresponding legal process."

The Assistant Attorney General, Edwin O. Vázquez Berrios, responded by letter to Officer Rivera. Vázquez noted that in cases such as this one, the Puerto Rico police investigate and file charges if necessary; the Department of Justice intervenes only after there has been a determination of probable cause and the case has been scheduled for trial. Accordingly, he forwarded the letter and the materials Rivera attached to the Superintendent of the Police "for any action he may deem pertinent." He did not inform either Officer Rivera or the Superintendent of the Police that the Department of Justice would not support prosecution in this matter, nor did he warn them that there may be constitutional infirmities in a prosecution.

Mangual's complaint stated he feared "prosecution by at least Officer Rivera, and possibly by other persons whose interest is obstructing publications regarding official corruption." Mangual also verified that he felt the effects of the threat of prosecution after the March 1999 articles. Police officers at Caguas Police Headquarters were being pressured not to give information to Mangual and were afraid to even be seen with him, seriously interfering with his work as a journalist.

There have been at least two other prosecutions under the criminal libel statute in the first six months of 2001. One of the complaints was brought on behalf of a Police Department lieutenant; the defendant was convicted and fined. In both cases, district attorneys from the Department of Justice were prosecuting. Neither case involved journalists or other members of the press. Details about the threats to the putative intervenors are discussed below.

## II. History of the Case

On September 17, 1999, Mangual filed a verified complaint in the U.S. District

---

**3.** This letter and the response from the Department of Justice were written in Spanish; we quote from the certified translation of Rivera's letter, and a translation provided by the plaintiff of the response.

Court for the District of Puerto Rico, requesting that the court declare sections 4101 to 4104 unconstitutional under the First Amendment. He also requested injunctive relief if necessary to protect his and others' First Amendment rights. With his complaint, Mangual filed a motion for summary judgment and a motion for an order to show cause and for expedited resolution. The suit named José Fuentes Agostini, the Secretary of Justice of the Commonwealth of Puerto Rico at the time of the initiation of the suit. Fuentes has since resigned, and he has been replaced as the defendant by the new Secretary of Justice, Angel Rotger-Sabat. *See* Fed. R.Civ.P. 25(d)(1). The suit also names John Doe as a defendant, to stand for any person who may be indispensable to the equitable relief requested.

Secretary Fuentes responded on October 18, 1999 by requesting the dismissal of the case for lack of jurisdiction. The Secretary also filed a memorandum opposing the plaintiff's motion for summary judgment. On May 2, 2000, Fuentes, no longer the Secretary, moved to dismiss the case entirely on the additional jurisdictional ground of mootness, because no criminal charges had been filed against Mangual, and the one-year statute of limitations had expired on March 17, 2000. *See* 33 P.R. Laws Ann. § 3412(b).

On May 11, 2000, two persons and an association moved to intervene as party plaintiffs under Fed.R.Civ.P. 24(a) (intervention of right). Two were reporters: Betancourt and Manny Suárez, who was a reporter for the *San Juan Star,* a *New York Times* stringer, and a professor of journalism. The third party was the Overseas Press Club, a nonprofit association of journalists, which said it had polled its members in the aftermath of the Betancourt prosecution and found that they feared criminal libel prosecution by the police even more than physical aggression. As a result, the Club claimed, its members were withholding publication of articles. The motion to intervene included affidavits from Betancourt, describing his prosecution, and Suárez, describing the chilling effect that prosecution had on his own journalism. Suárez said, "I am in a catch-22 situation, damned if I do, damned if I don't. Clearly, the alternative to not living under the risk of prosecution for libel … is not to publish. But, is this not a 'chilling effect'?" The district court denied these parties status as intervenors[4] but granted them leave to file an amicus brief, which they did. On July 24, 2000, the case was transferred from Judge Daniel Domínguez to Judge Jay A. García-Gregory.

On October 27, 2000, Caribbean and Jorge Medina, another journalist who wrote for *El Vocero,* filed an application to intervene as plaintiffs under Fed.R.Civ.P. 24(b) (permissive intervention). The application to intervene included an affidavit from Medina. The application was in part based on a threat of prosecution which had been leveled at Medina. Medina wrote three articles in October 2000 in *El Vocero* involving allegations of certain conduct by a Puerto Rico gubernatorial candidate. The candidate's campaign director, at a press conference, announced the filing of a civil suit against Medina and threatened to file a criminal complaint. The campaign director stated that the publications constituted criminal libel and such actions were a felony punishable by jail. Medina was present and felt threatened.

---

4. Betancourt, Suárez, and the Overseas Press Club do not appeal the denial of their motions to intervene.

On March 28, 2002, the district court dismissed Mangual's case, and denied Medina and Caribbean's motions to intervene, for lack of subject matter jurisdiction. The court held that the plaintiff and intervenors all lacked standing to sue, and that the plaintiff's claims were both unripe and moot. *Mangual v. Fuentes Agostini*, 203 F.Supp.2d 78, 81 (D.P.R.2002). Mangual appeals the dismissal of his claim, and Medina and Caribbean appeal the denial of their motion to intervene.

### III. Legal Analysis

■ Challenges to subject matter jurisdiction based on standing, ripeness, and mootness are often pure matters of law, and thus engender de novo review. *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir.2001); *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 12 (1st Cir. 1996). The party invoking federal jurisdiction has the burden of establishing that it exists. *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 30 (1st Cir.1999). For the purposes of reviewing the district court's rulings, we accept as true all material allegations in the complaint and intervenors' motions and construe them in favor of the plaintiff and intervenors. *See Pennell v. San Jose*, 485 U.S. 1, 7, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988); *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). There are no material facts in dispute.

#### A. *Justiciability of Plaintiff's Claim*

##### 1. *Standing*

###### a. *Legal Standards*

■ The doctrine of standing is of both constitutional and prudential dimension. *See Barrows v. Jackson*, 346 U.S. 249, 255–56, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). The necessity to establish constitutional standing is rooted in the case or controversy requirement of the Constitution. *See U.S. Const.* art. III, § 2. "[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth*, 422 U.S. at 498–99, 95 S.Ct. 2197 (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

■ The burden to establish standing lies with the party invoking federal jurisdiction. *Bennett v. Spear*, 520 U.S. 154, 167–68, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). A plaintiff must show:

that (1) he or she personally has suffered some actual or threatened injury as a result of the challenged conduct; (2) the injury can be fairly traced to that conduct; and (3) the injury likely will be redressed by a favorable decision from the court.

*N.H. Right to Life*, 99 F.3d at 13 (internal citations omitted); *see Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

■■ A paradigm of a case or controversy under Article III is a challenge to a statute that imposes criminal penalties for constitutionally protected activities by a person likely to be subject to the statute. *Diamond v. Charles*, 476 U.S. 54, 64, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). A party need not violate the statute and suffer the penalty in order to generate a conflict worthy of standing in federal court. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). In challenges under the First Amendment, two types of injuries may confer Article III standing without necessitating that the challenger actually undergo a criminal prosecution. The first is when "the plaintiff has alleged an

intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution." *Id.* Plaintiffs may have standing even if they have never been prosecuted or threatened with prosecution. *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). The second type of injury is when a plaintiff "is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *N.H. Right to Life*, 99 F.3d at 13; *see Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); *Meese v. Keene*, 481 U.S. 465, 473, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987). Plaintiffs need not place themselves "between the Scylla of intentionally flouting state law and the Charybdis of forgoing ... constitutionally protected activity." *Steffel v. Thompson*, 415 U.S. 452, 462, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

■ A plaintiff's subjective and irrational fear of prosecution is not enough to confer standing under Article III for either type of injury. *See Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) ("[A]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."). Both the injury based on threat of prosecution and the injury based on self-censorship depend on "the existence of a credible threat that the challenged law will be enforced." *N.H. Right to Life*, 99 F.3d at 14. Put another way, the fear of prosecution must be "objectively reasonable." *R.I. Ass'n of Realtors*, 199 F.3d at 31; *see also N.H. Right to Life*, 99 F.3d at 14.

■ As to whether a First Amendment plaintiff faces a credible threat of prosecution, the evidentiary bar that must be met

is extremely low. "[C]ourts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* at 15. The Supreme Court has often found standing to challenge criminal statutes on First Amendment grounds even when those statutes have never been enforced. *See, e.g., Babbitt*, 442 U.S. at 302, 99 S.Ct. 2301; *Doe*, 410 U.S. at 188, 93 S.Ct. 739; *see also R.I. Ass'n of Realtors*, 199 F.3d at 32 (finding a credible threat of prosecution under a statute that had never been enforced, in part because it was enacted "only twenty years ago"). A finding of no credible threat of prosecution under a criminal statute requires a long institutional history of disuse, bordering on desuetude. *See Poe v. Ullman*, 367 U.S. 497, 501, 507, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (denying standing based on an eighty-year-old "tacit agreement" by the state not to prosecute).

#### b. *Application of Standards*

■ The district court correctly found that Mangual meets both the second prong of the standing test, "causation," and the third prong, "redressability." *Mangual*, 203 F.Supp.2d at 84. There is no question that if an injury exists, it is caused by the criminal libel statute. Redressability is also not in question; when a statute is challenged as unconstitutional, the proper defendants are the government officials whose role it is to administer and enforce it. *See Diamond*, 476 U.S. at 57 n. 2, 106 S.Ct. 1697. The district court incorrectly found, however, that Mangual fails the "injury in fact" requirement because there is no "credible threat of prosecution." *Mangual*, 203 F.Supp.2d at 84 (quoting *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301).

We think it apparent that Mangual has standing to challenge Puerto Rico's criminal libel statute. In his complaint, Mangu-

al asserts standing under both alternative prongs of the *N.H. Right to Life* standing rubric. First, Mangual faced and continues to face a real threat of prosecution. "The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 830, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989); *see Becker v. FEC*, 230 F.3d 381, 386 n. 4 (1st Cir.2000). At the time this action was brought, Mangual was under actual threat of prosecution by Officer Rivera, a threat that was surely a credible one; furthermore, the Department of Justice advanced the prosecution when it forwarded Rivera's complaint to the local police. There is no question Mangual had standing at that time.

Mangual also has standing based on other factors. He states an intention to continue covering police corruption and writing articles similar to those which instigated Rivera's threat of prosecution. He asserts that there are several other individuals who have been mentioned in published articles he has authored who are inclined to prosecute him for criminal libel. The investigations into these individuals are ongoing, and further articles will be written, exacerbating Mangual's exposure to a criminal libel prosecution. Thus, even discounting Rivera's threat of prosecution, Mangual has shown a credible threat of prosecution for continuing his work as a journalist.

Second, Mangual asserts the existence of a "chilling effect of a very serious nature" on his investigative reporting due to the possibility of prosecution. The effect of the statute, as alleged by Mangual, has been severe. While insurance is available to cover civil libel cases, none is available to cover the legal fees or fines resulting from criminal libel charges. As a result, there is nothing Mangual can do to limit his exposure other than to curtail his investigative and journalistic activities. Mangual also says there is a danger his sources will silence themselves if he is criminally prosecuted and forced to disclose his sources to prove the truth of his allegations. The threat of prosecution against Mangual, and the ensuing chilling effect, certainly exceed the low probability threshold required for First Amendment standing purposes.

Puerto Rico's criminal libel statute is not an antiquated and moribund statute; it is less than thirty years old. Although it has been amended four times since *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), was decided, the amendments have not attempted to conform the statute to the requirements of the First Amendment. The most recent amendment was in December 1999; it increased the criminal penalties dramatically in order to deter "anti-social" acts, including increasing the maximum fine tenfold. When the Department of Justice was asked to comment on this change during the pendency of this litigation, it supported the increased penalty without raising any federal constitutional concerns. The only constitutional protection the Department of Justice raised was "the constitutional protection that exists against attacks against honor and reputation." The defendants do not argue that the statute is not in current use; they cannot, for it has been recently used.

Nor does the libel statute carve out any exception for journalists. The prosecution of Betancourt in 1999, thwarted only by the judge in the probable cause hearing, belies the claim that journalists are immune from prosecution. The Secretary of Justice has not unequivocally stated a policy against prosecution of such cases, and the Secretary's actions gainsay any such avowal. Indeed, when Officer Rivera

threatened to institute a criminal libel action against Mangual and notified the Department of Justice, the Department did not advise against it.

■■ Even if the Department of Justice did disavow any intention to prosecute either any criminal libel cases or any cases against journalists, and it adhered to that policy, Mangual would still have a credible fear of having criminal charges filed against him by the local police, whom he has accused of corruption, and other government officials similarly accused. Under Puerto Rico law, if the crime is a misdemeanor, individuals may file a complaint with the police or pro se; it is after probable cause is shown and the matter is set for trial that the Justice Department steps in to prosecute the case. The Secretary exercises no control over whom the local police choose to prosecute for misdemeanors; indeed, as the history of Betancourt's prosecution indicates, at least one local police department prosecuted despite a federal court injunction ordering it not to prosecute. The plaintiff's credible fear of being haled into court on a criminal charge is enough for the purposes of standing, even if it were not likely that the reporter would be convicted.

■■ The defendants do not raise separate prudential standing concerns, and we see none. "[A] realistic risk of future exposure to [a] challenged policy . . . is sufficient to satisfy" prudential as well as constitutional standing concerns. *Berner v. Delahanty*, 129 F.3d 20, 24 (1st Cir.1997). Mangual's complaint makes a sufficient showing of a credible threat of prosecution to secure standing under Article III.

### 2. *Ripeness*

■■ The district court also found that Mangual's claim was not ripe. Like standing, the doctrine of ripeness has roots in both the Article III case or controversy

requirement and in prudential considerations. *See R.I. Ass'n of Realtors*, 199 F.3d at 33 (citing *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 242–44, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). Determining ripeness requires the evaluation of "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

■■ The inquiry into fitness is both a constitutional and a prudential one. The constitutional inquiry, grounded in the prohibition against advisory opinions, is one of timing. *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). "[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs.*, 387 U.S. at 148, 87 S.Ct. 1507. The prudential concern is whether resolution of the dispute should be postponed in the name of "judicial restraint from unnecessary decision of constitutional issues," *Reg'l Rail Reorganization*, 419 U.S. at 138, 95 S.Ct. 335; if elements of the case are uncertain, delay may see the dissipation of the legal dispute without need for decision. By contrast, the inquiry into hardship is wholly prudential. *See generally* 1 L. Tribe, *American Constitutional Law* § 3–10 (3d ed.2000).

■■ The district court found that Mangual's claim is unripe, because he "is under no immediate or direct dilemma of facing a prosecution," and because he "has not described a concrete plan to engage in libel." *Mangual*, 203 F.Supp.2d at 87. The district court did not make clear under which prong of the ripeness determination it was operating, or whether its concerns were constitutional or prudential. It appears that the district court was making a pru-

dential determination based on fitness. The reasoning seems to be that because Mangual might not in fact engage in activities that run afoul of the statute, or because he might never be prosecuted, the court should decline to consider the merits of the constitutional challenge.

The district court's analysis has two errors. First, its analysis under the ripeness doctrine that Mangual does not face a "credible threat of prosecution" is simply a repetition of its standing decision, one that is mistaken. Mangual has averred an intention to continue his work as an investigative journalist, and the recent prosecutions under the criminal libel law indicate a real threat of prosecution for his work. Ripeness does not require that he wait for such a prosecution.

█ Second, the district court failed to consider Mangual's alternative ground for standing: the chilling effect that the statute has on his work as a journalist. If that effect emanates from a credible threat of prosecution, as it does here, Mangual need not either describe a plan to break the law or wait for a prosecution under it. The purpose of the alternative ground for standing in such cases is so that plaintiffs need not break the law in order to challenge it. "[T]he doctrine of ripeness ... asks whether an injury that has not yet happened is sufficiently likely to happen to warrant judicial review." *Gun Owners Action League, Inc. v. Swift*, 284 F.3d 198, 205 (1st Cir.2002) (internal quotation omitted). Here, that injury, the chilling effect, is not only likely but has already come to pass. We find that Mangual's claim is ripe for resolution.

### 3. *Mootness*

█ The doctrine of mootness enforces the mandate "that an actual controversy must be extant at all stages of the review, not merely at the time the com-

plaint is filed." *Steffel*, 415 U.S. at 460 n. 10, 94 S.Ct. 1209. Thus, mootness can be viewed "as 'the doctrine of standing set in a time frame.'" *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (quoting H.P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973)). If events have transpired to render a court opinion merely advisory, Article III considerations require dismissal of the case. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). The burden of establishing mootness rests squarely on the party raising it, and "[t]he burden is a heavy one." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). It must be "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). We exercise de novo review when determining whether a case is moot. *Verhoeven v. Brunswick Sch. Comm.*, 207 F.3d 1, 5 (1st Cir.1999).

█ The district court found that Mangual's claim is moot, because the one-year statute of limitations has expired as to an action based on the newspaper articles about which Officer Rivera threatened prosecution. *Mangual*, 203 F.Supp.2d at 89; *see* 33 P.R. Laws Ann. § 3412(b). This mootness determination is incorrect. A pending prosecution is not required for a party to have standing, even if standing is asserted on the basis of a party's intent to engage in potentially law-breaking activity. If events have transpired to render a court opinion merely advisory, Article III considerations require dismissal of the case. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379 (1979). The doctrine of mootness enforces the mandate

"that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed." *Steffel*, 415 U.S. at 460 n. 10, 94 S.Ct. 1209. Thus, mootness can be viewed "as 'the doctrine of standing set in a time frame.' " *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202 (1980)(quoting H.P. Monaghan, *Constitutional Adjudication: the Who and When*, 82 Yale L.J. 1363, 1384 (1973)). The Supreme Court has qualified this description and made clear that standing and mootness are not completely analogous doctrines: "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190, 120 S.Ct. 693 (2000). This is because the burden of establishing mootness rests squarely on the party raising it, and "[t]he burden is a heavy one." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894 (1953). It must be "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361 (1968). We exercise de novo review when determining whether a case is moot. *Verhoeven v. Brunswick Sch. Comm.*, 207 F.3d 1, 5 (1st Cir.1999).

Mangual's claims are not moot. The district court erred in dismissing the case on that basis.

### B. *Intervenors*

■ The district court, in a summary discussion, found that both Medina's and Caribbean's allegations of injury amount to mere subjective fears and fail to meet the "objectively reasonable" test required to create a case or controversy. *Mangual*, 203 F.Supp.2d at 90. We review denial of intervention for abuse of discretion. *See*

*Allen Calculators, Inc. v. Nat'l Cash Register Co.*, 322 U.S. 137, 142, 64 S.Ct. 905, 88 L.Ed. 1188 (1944); *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 172 F.3d 104, 109, 113 (1st Cir.1999). It is an abuse of discretion for the district court to apply an erroneous standard of law. It is clear that the district court applied several erroneous standards in its legal analysis of Medina's standing and that its conclusion as to the "objective reasonableness" of Medina's fear of prosecution was in error, and so there was an abuse of discretion.

■ Whether standing is required for intervenors is an as yet unsettled question. The controversy over whether intervention of right under Fed.R.Civ.P. 24(a) requires Article III standing is a well-known one. *See Diamond*, 476 U.S. at 68–69 & n. 21, 106 S.Ct. 1697; *Daggett*, 172 F.3d at 109. The requirement of standing for permissive intervenors has received less attention but is no less unsettled. The traditional rule was that standing was required for permissive intervenors but not for intervenors of right. In part because of the 1990 amendments to the supplemental jurisdiction statute, Judicial Improvements Act of 1990, Pub.L. No. 101–650, Title III, § 310, 104 Stat. 5089, 5113–14 (codified at 28 U.S.C. § 1367 (2000)), the standing requirements for intervenors are now greatly confused. C.A. Wright & M.K. Kane, *Law of Federal Courts* § 75, at 548 (6th ed.2002). It is clear that an intervenor, whether permissive or as of right, must have Article III standing in order to continue litigating if the original parties do not do so. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 65, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Diamond*, 476 U.S. at 68, 106 S.Ct. 1697. However, the circuits are split on the question of whether standing is required to intervene if the original parties are still pursuing the case and thus maintaining a case or controversy, as they are here.[5]

---

**5.** Some cases have held that intervenors must independently meet Article III standing requirements. *See, e.g., EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046

■ We need not decide this complicated question, because it is clear that Medina has sufficient standing under Article III. Medina is also a journalist working for *El Vocero* who has been threatened with prosecution under the Puerto Rico criminal libel statute. While the statute of limitations has expired as to that particular threat, he continues to work as a journalist and to risk prosecution under the statute. As such, he is in a position like that of Mangual. Medina has expressed the fear that he may be prosecuted and has articulated his desire to continue publishing, as a journalist, on matters that may draw a libel prosecution. Given the history of threatened and actual prosecution under the statute detailed above, Medina has evidenced enough of a threat to establish standing to intervene in this suit.

■ Under the circumstances of this case, we see no reason to remand for consideration of Medina's motion to intervene under the correct legal standards. We grant Medina's motion to intervene for several reasons. First, the only objection raised as to intervention was standing, and that has now been resolved in Medina's favor.[6] Second, because we go on to resolve the merits, there is no point in remanding this issue. Third, we have the discretion to permit intervenors at the appellate level, and we choose to do so here. *See Ruthardt v. United States*, 303 F.3d 375, 386 (1st Cir.2002).

Caribbean has also moved to intervene, based upon the potential injury done to the newspaper it owns, *El Vocero*, through the prosecution of its journalist employees.

Because we hold that both the plaintiff, Mangual, and the intervenor, Medina, have standing to challenge the Puerto Rico criminal libel statute, we need not reach the question of whether a newspaper can assert standing to challenge a criminal libel statute based on threats of prosecution against its reporters.

C. *Abstention*

■ In the district court the defendants argued that the plaintiff and intervenors could vindicate their rights by undergoing criminal prosecution and presenting the *Garrison* issues to the Puerto Rico courts. For this reason, they argued, the federal court should abstain. Such an argument fundamentally misunderstands the law of pre-enforcement action under the First Amendment and of abstention. On appeal the Secretary urges that the federal court stay its hand and wait "until the Puerto Rico Supreme Court has had the opportunity to express itself." That opportunity would presumably arise on appeal from a conviction of a media defendant under the criminal libel statute.

At no time has the Secretary of Justice identified any unclear issue of state law, as opposed to federal constitutional law, in this dispute. Nor has the Secretary ever requested certification of any such issue to the Puerto Rico Supreme Court. We also note that this statute has been in place since 1974, and the Puerto Rico courts have had ample opportunity to construe this statute. When asked to apply the statute in light of federal constitutional

(D.C.Cir.1998); *Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir.1996). Others have held that intervenors need not show standing if the original parties remain in the case. *See, e.g., Ruiz v. Estelle*, 161 F.3d 814, 830 (5th Cir. 1998); *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir.1989). *See generally* A.M. Gardner, Comment, *An Attempt To Intervene in the Confusion: Standing Requirements for Rule 24*

*Intervenors*, 69 U. Chi. L. Rev. 681, 691–98 (2002) (collecting cases).

6. Neither the district court below, nor the defendants on appeal, argue that Medina or Caribbean's claims are unripe or moot; they challenge jurisdiction over the intervenors' claims purely on the basis of standing. In any event, the intervenors' claims are neither moot nor unripe.

concerns in *People v. Olivero Rodríguez,* 112 P.R. Offic. Trans. 460 (1982), the court did not address the federal constitutional issues which concern us. Moreover, the question is less one of construal of an unclear issue than of judicial rewriting of the statute—a statute that is not "readily susceptible" to a narrowing construction. *See Am. Booksellers Ass'n,* 484 U.S. at 397, 108 S.Ct. 636.[7]

◼◼◼◼ Defendants say their abstention argument falls under the *Pullman* abstention doctrine. *R.R. Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). There the Supreme Court abstained from deciding a constitutional issue which turned on an interpretation of state law until the state courts were given the chance to clarify the state law issue. *Id.* at 500, 61 S.Ct. 643. The *Pullman* doctrine requires that "when a federal constitutional claim is premised on an unsettled question of state law, the federal court should stay its hand in order to provide the state courts an opportunity to settle the underlying state law question and thus avoid the possibility of unnecessarily deciding a constitutional question." *Harris County Comm'rs Court v. Moore,* 420 U.S. 77, 83, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975). Federal courts abstaining under *Pullman* generally retain jurisdiction but stay the federal suit pending a state court decision, unless the state courts cannot proceed due to a prohibition on advisory opinions, in which case it is dismissed without prejudice. *See* Tribe, *supra,* § 3–29 n.37. To determine whether *Pullman* ab-

stention is appropriate, "we consider two factors: (1) whether there is substantial uncertainty over the meaning of the state law at issue; and (2) whether a state court's clarification of the law would obviate the need for a federal constitutional ruling." *Ford Motor Co. v. Meredith Motor Co.,* 257 F.3d 67, 71 (1st Cir.2001). Neither condition is met here.

◼◼◼ If state law questions are unambiguous, abstention is inappropriate. *Examining Bd. v. Flores de Otero,* 426 U.S. 572, 598, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). The statute is not ambiguous; the only issue is a federal constitutional one. Since there is no ambiguous question under Puerto Rico law, abstention is impermissible. *See Wisconsin v. Constantineau,* 400 U.S. 433, 438, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *Rivera–Puig v. Garcia–Rosario,* 983 F.2d 311, 322 (1st Cir. 1992).

The need for a federal constitutional ruling would not be obviated by abstention. That the defendants may prefer to have the federal constitutional ruling made by a Puerto Rico court rather than by a federal court is of no moment. The Puerto Rico courts would be faced with exactly the same issues as this Court—issues which are federal ones and not ones of Puerto Rico law. The plaintiff is entitled to his federal forum. Were we to abstain in this matter, we would merely "await an attempt to vindicate the same claim in a state court," *McNeese v. Bd. of Educ.,* 373 U.S. 668, 672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), and that we may not do. *City*

---

**7.** The vast majority of state courts that have found constitutional infirmities in criminal libel statutes have declined to rewrite them but have instead struck them down. *See, e.g., Ivey v. State,* 821 So.2d 937 (Ala.2001); *Gottschalk v. State,* 575 P.2d 289 (Alaska 1978); *Weston v. State,* 258 Ark. 707, 528 S.W.2d 412 (1975); *Eberle v. Mun. Court,* 55 Cal.App.3d 423, 127 Cal.Rptr. 594 (1976); *People v. Ryan,* 806

P.2d 935 (Colo.1991) (partial invalidation); *State v. Helfrich,* 277 Mont. 452, 922 P.2d 1159 (1996); *State v. Powell,* 114 N.M. 395, 839 P.2d 139 (App.1992); *Commonwealth v. Armao,* 446 Pa. 325, 286 A.2d 626 (1972); *I.M.L. v. State,* No. 20010159, 2002 WL 31528479, 2002 Utah LEXIS 171 (Nov. 15, 2002).

*of Houston v. Hill,* 482 U.S. 451, 467–69, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987).

■ Not only does the case fall short of these two standards, but the delay involved in abstention is especially problematic where First Amendment rights are involved. *Id.* at 467, 107 S.Ct. 2502 ("[W]e have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment."). Abstention in these circumstances would be unwarranted.

D. *First Amendment Challenge*

1. *Procedural Posture*

■ Normally, when a district court dismisses a matter on jurisdictional grounds and this court reverses, the case is remanded for consideration of the merits. *See, e.g., Rivera–Gomez v. de Castro,* 843 F.2d 631, 634–35 (1st Cir.1988). However, "[w]here the merits comprise a purely legal issue, reviewable de novo on appeal and susceptible of determination without additional factfinding, a remand ordinarily will serve no useful purpose." *N.H. Right to Life,* 99 F.3d at 18; *see, e.g., United States v. Pierro,* 32 F.3d 611, 622 (1st Cir.1994); *Cohen v. Brown Univ.,* 991 F.2d 888, 904 (1st Cir.1993); *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 642 (1st Cir.1992). In *N.H. Right to Life,* we confronted a similar circumstance: we reversed a district court's dismissal, on standing grounds, of a First Amendment challenge to a state statute. There, we reached the merits of the plaintiff's constitutional challenge. 99 F.3d at 18. We do so here as well.

■ The issues in contention are pure ones of federal law. At both the district court level and here, there have been arguments on the merits from both sides, after limited discovery. Mangual filed a verified complaint, and there are relevant affidavits in the record from Medina, Suárez and Betancourt. Mangual also filed a motion for summary judgment and addressed the merits of his First Amendment claim, arguments he repeated in his appellate brief. The Secretary also addressed the merits, both in a memorandum opposing summary judgment before the district court and in his appellate brief. Importantly, he did not oppose summary judgment on the ground that there were material facts in dispute.

This case asserting ongoing violations of constitutional rights has also been prolonged for far too long. Mangual first filed his complaint in September of 1999, when he also requested summary judgment. Since that time he has requested adjudication of this motion three times: in November 1999, in May 2000, and in June 2000. The case was transferred to a new judge in July 2000, and between that time and March 2002, no action was taken on the summary judgment motion. A resolution of this case is now due, if not past due.

2. *Merits of First Amendment Claim*

■ The speech threatened here with prosecution under the criminal libel statute is at the heart of the First Amendment protections of speech and the press.

The core facts are these: A newspaper publishes a series of stories about corruption in government. In turn, the government responds with actual and threatened criminal prosecution of the reporters. The newspaper later publishes a story critical of a candidate for high public office; the reporter is threatened with criminal prosecution. The free press is threatened for commenting on public officials on matters of public concern.

"[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discus-

sion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). "For speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison*, 379 U.S. at 74–75, 85 S.Ct. 209. "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg v. California*, 283 U.S. 359, 369, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).

The history of the United States has been marked by a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The skepticism of government and the importance of the right to freely criticize it are concepts with both deep roots in American history and continuing importance. *See* 1 J. Trenchard & T. Gordon, *Cato's Letters: Essays on Liberty, Civil and Religious* 96, 246–47 (1755) ("The exposing therefore of publick Wickedness, as it is a Duty which every Man owes to Truth and his Country, can never be a Libel in the Nature of Things."); C.R. Sunstein, *Democracy and the Problem of Free Speech* 134 (1993) (arguing that distrust of the government is strongest when "it is regulating speech that might harm its own interests; and when the speech at issue is political, its own interests are almost always at stake. It follows that the premise of distrust of government is strongest when politics is at issue").

Against these fundamental principles we evaluate the criminal libel statute challenged here, sections 4101–4104. We find the statute unconstitutional under the First Amendment standards established by the Supreme Court.

### a. *Actual Malice*

▇ The seminal *New York Times* case contains several requirements that constrain libel law when the challenged statement is about a public official. For public officials to recover damages, they must prove "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. 710. Even when erroneous statements are published, the statements may be protected, because "erroneous statement is inevitable in free debate." *Id.* at 271, 84 S.Ct. 710. The "actual malice" standard is distinct from common law malice, which refers to spite or ill will. *See Rosenbloom v. Metromedia*, 403 U.S. 29, 52 n. 18, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); *Garrison*, 379 U.S. at 78, 85 S.Ct. 209 (actual malice does not mean "hatred, ill will or enmity or a wanton desire to injure").

▇ The court originally defined "public official" narrowly: "The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Rosenblatt v. Baer*, 383 U.S. 75, 86, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). In practice, the term is now used more broadly and includes many government employees, including police officers. L. Tribe, *American Constitutional Law* § 12–12, at 866 (2d ed.1988); *see, e.g., St. Amant v. Thompson*, 390 U.S. 727, 730 & n. 2, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (deputy

sheriff); *Price v. Viking Penguin, Inc.,* 881 F.2d 1426, 1431 (8th Cir.1989) (FBI agent); *Coughlin v. Westinghouse Broad. & Cable, Inc,* 780 F.2d 340, 342 (3d Cir. 1985) (police officer); *McKinley v. Baden,* 777 F.2d 1017, 1021 (5th Cir.1985) (same); *Gray v. Udevitz,* 656 F.2d 588, 591 (10th Cir.1981) (same); *Meiners v. Moriarity,* 563 F.2d 343, 352 (7th Cir.1977) (federal narcotics agent). The Court later extended actual malice protection to speech about public figures as well as public officials. *See Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 665–66, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (describing the convoluted history of this doctrine). While the definition of "public figure" remains opaque, political candidates unquestionably fall under that rubric. *Id.* at 660, 109 S.Ct. 2678; *see Monitor Patriot Co. v. Roy,* 401 U.S. 265, 271, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971).

■ In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court also applied constitutional constraints to civil suits for defamation when the plaintiff is a private person but the statement involves matters of public concern. *Id.* at 335, 347, 94 S.Ct. 2997. For actual damages to be awarded, such statements are not afforded the actual malice protection given to statements concerning public officials or figures, but some level of fault must be proven, be it negligence or something more. *Veilleux v. NBC,* 206 F.3d 92, 108 (1st Cir.2000).[8]

The actual malice standard, and other constitutional protections of criticisms of public officials, were extended to the criminal libel context in *Garrison.* The court held that criminal libel statutes share the constitutional limitations of civil libel law. 379 U.S. at 67, 85 S.Ct. 209.

■ Section 4101, on its face, is constitutionally deficient, in that it does not require that the *New York Times* and *Garrison* standard of actual malice be proven in order for a statement disparaging a public official or figure to be successfully prosecuted. The statute does not, by its terms, require proof that the defendant either knew of the statement's falsehood or acted with reckless disregard of falsehood. Therefore, section 4101 is unconstitutional under *Garrison,* 379 U.S. at 74, 85 S.Ct. 209.

The Secretary maintains that section 4101 has been narrowed by the Supreme Court of Puerto Rico to incorporate the *New York Times* actual malice standard. The Secretary points to *Olivero.* There the court described the elements of the case: "a real and malicious intent, indicating the untruth of the fact and reckless disregard for the truth ('malice' animus injuriandi) which is expressed directly in a publication ... which communicates information tending to denigrate a person's worth." 112 P.R. Offic. Trans. at 465.

Our reading of *Olivero* is quite different, and we think it does not at all mean what the Secretary offers. That case did not address the *New York Times* or *Garrison* requirement of actual malice. It did cite federal caselaw, but only for the question of who qualifies as a public figure, and it found that the case did not involve a public figure. Further, the opinion's use of the "reckless disregard" phrase is followed by the Latin phrase "animus injuriandi," defined as "The intention to injure, esp. to

8. The threats of prosecution to which the plaintiffs point all involve statements regarding either public officials, such as police officers, or public figures, such as political candidates. Thus, we have no occasion to consider whether the Puerto Rico criminal libel statute is unconstitutional as applied to statements about private figures on matters of public concern.

insult." *Black's Law Dictionary* 87 (7th ed. 1999). That standard is materially different from the one dictated by *New York Times*. *See Garrison*, 379 U.S. at 78, 85 S.Ct. 209. The *Olivero* decision uses "reckless disregard" to further define "a real and malicious intent," and it does not impose a distinct requirement of knowing or reckless disregard for the statement's truth.

### b. *Truth as a Defense*

 In addition to the actual malice standard, *Garrison* requires that in a criminal libel prosecution for a statement concerning a public official, truth must be a complete defense. Section 4102 does permit an unqualified affirmative defense of truth, but it does so only if the victim "is a public officer and the charge made refers to the performance of his duties." Otherwise, truth is only a defense if the defendant "had good intention and justifiable ends." The section 4102 defense of truth is not broad enough to encompass all constitutionally protected statements. This affirmative defense is constitutionally deficient.

 First, section 4102 only applies to statements about public officials in the performance of official duties. Under *Garrison*, the public officials exception does not extend only to the discharge of official duties, but to "anything which might touch on an official's fitness for office," including "dishonesty, malfeasance, or improper motivation." 379 U.S. at 77, 85 S.Ct. 209. The affirmative defense under section 4102 is not broad enough to cover all such statements concerning public officials. And the default provision—that the defendant may otherwise prove truth as a defense only by showing "good intentions and justifiable ends"—does not cure the problem; it exacerbates it.

 The statutory affirmative defense also does not protect all public figures, only public officers. *Garrison* rejected any notion that the allegedly libelous utterance must have been published "with good motives and for justifiable ends," as applied to public officials. 379 U.S. at 70–73, 85 S.Ct. 209. Later rulings expanded the *New York Times* standard to statements regarding public figures. *See Gertz*, 418 U.S. at 335, 94 S.Ct. 2997. Thus, truth must be a complete defense for all public figures, not merely public officials. Section 4102 does not provide such protection for statements involving public figures who are not officials. For these reasons, section 4102 is unconstitutional.[9]

---

**9.** The criminal libel statute makes no mention of any requirement that the prosecution prove a defendant's knowledge of falsity or recklessness with regard to falsity. The plaintiff and intervenors allege that this also makes the statute unconstitutional.

It is an open question whether criminal libel statutes must include non-truth as an element of the crime instead of truth as an affirmative defense. The Supreme Court, in *Garrison*, indicated that the constitutional protections in the civil arena should apply to criminal libel prosecutions as well. *See* 379 U.S. at 74, 85 S.Ct. 209 ("We held in *New York Times* that a public official might be allowed the civil remedy only if he establishes that the utterance was false.... The reasons which led us so to hold ... apply with no less force merely because the remedy is criminal."). The Supreme Court has also required that libelous statements in civil cases on matters of public concern be proven false, at least against media defendants. *Phila. Newspapers v. Hepps*, 475 U.S. 767, 778, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

One concern about placing the burden of proving truth on the defendant is that it may require defendants to waive their Fifth Amendment rights in order to take advantage of the *New York Times* standards. In other words, the Puerto Rico statute potentially puts defendants into the position of choosing between their First and Fifth Amendment rights. Another concern is that journalists may be unable to protect confidential sources

### c. *Report of Official Acts*

■ Section 4103 also applies to plaintiff's activities. Mangual investigated and reported the details of the judicial proceedings against Betancourt. Mangual also reported on other acts of official character, the internal investigations of the police department. Section 4103 states that, as to judicial or legislative acts, or any other act of "official character," any report or statement *which is true and fair* "shall [not] be considered to be libelous." The official Spanish version, enacted in 1974, uses "imparcial y exacta," rendered in the official English translation as "true and fair."

■ Taking the statute as officially translated, we think the "fairness" requirement is itself constitutionally deficient. A true report of an official act is not protected; the report must be "fair" as well. It is inconsistent with First Amendment standards to require that a true statement about official acts must also be fair. Further, when proving actual malice, falsity is not established by "minor inaccuracies," whether deliberate or not. *Masson v. New Yorker Magazine*, 501 U.S. 496, 516–17, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). In order to amount to a known or reckless falsehood, the alteration must result "in a material change in the meaning conveyed by the statement." *Id.* at 517, 111 S.Ct. 2419; *see Crane v. Ariz. Republic*, 972 F.2d 1511, 1521 (9th Cir.1992). Otherwise, small inaccuracies, if the product of knowing or reckless behavior, could form the basis of liability even when commenting about public officials or figures.

Mangual and the intervenors argue that the translation of the passage as "true and fair" is neither true nor fair: they say the original Spanish translates more accurately to "impartial and exact." Their complaint appears to be a valid one. *See Oxford Spanish Dictionary* 277, 335 (1996). Indeed, the only other Puerto Rico statute that has a passage which is translated as "true and fair" is 33 P.R. Laws Ann. § 517(5), and there the original Spanish is "verdadero y justo." Were the statute read literally in Spanish, an exactness standard (even an impartiality standard) is even more clearly constitutionally deficient, for the reasons stated above.

In the end, the constitutional infirmity does not depend on whether the original Spanish or the official English translation is relied upon. Section 4103 is not broad enough to privilege minor inaccuracies when reporting on government acts, statements, or debates.

### d. *Further Arguments*

The plaintiff and intervenors challenge the criminal libel statute on two additional grounds. First, they argue that the penalty of restitution permitted by section 4101 violates the *Gertz* requirement that damages be proven unless liability is established under the actual malice standard. *See Gertz*, 418 U.S. at 349–50, 94 S.Ct. 2997 (prohibiting "presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth" and requiring that "all awards must be supported by competent evidence concerning the injury"). Second, plaintiffs independently challenge section 4104, which re-

---

if required to prove the truth of published statements.

It may be that the Supreme Court will reason that the requirement that civil plaintiffs prove falsity in certain circumstances means that prosecutors must also prove falsi-

ty as an element of the crime of libel in those circumstances. However, because the Supreme Court has yet to rule on this precise issue, and because the Puerto Rico criminal libel statute clearly has other constitutional infirmities, we need not reach this issue.

quires that the criminal court "shall order" the publication of conviction for libel through the same or analogous means as the libel was published. The plaintiff and intervenors argue that this provision unconstitutionally violates editorial independence under the standards set out in *Miami Herald v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).

■ We have held that section 4101 violates the First Amendment under several analyses; as to section 4104, there is no severability clause, and this section would in any event lack force standing alone. We need not reach the separate questions of whether the penalty of restitution or the requirement of publication of conviction violates the First Amendment.

*Conclusion*

We hold that the Puerto Rico criminal libel statute incorporates constitutionally invalid standards in the context of statements about public officials or public figures. We hold that Puerto Rico's criminal libel statute, 33 P.R. Laws Ann. §§ 4101–4104, is unconstitutional under the First Amendment as applied to statements regarding public officials or figures. We *reverse* the denial of Medina's motion to intervene and *grant* intervention to Medina, *reverse* the dismissal of the case on jurisdictional grounds, and *remand* the case with instructions that the district court enter a declaratory judgment and injunctive relief consistent with this opinion. So ordered. Costs are awarded to Mangual and Medina.