*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0121P (6th Cir.)
File Name: 04a0121p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

LEE BRENNEMAN,
  *Plaintiff-Appellant,*

  *v.*

MEDCENTRAL HEALTH
SYSTEM,
  *Defendant-Appellee.*

No. 02-3623

———————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-01052—John M. Manos, District Judge.

Argued: March 18, 2004

Decided and Filed: April 26, 2004

Before: KENNEDY, ROGERS, and COOK, Circuit
Judges.

———————

## COUNSEL

**ARGUED:** Natalie F. Grubb, Medina, Ohio, for Appellant.
Michael N. Chesney, FRANTZ WARD, Cleveland, Ohio, for
Appellee. **ON BRIEF:** Natalie F. Grubb, Medina, Ohio, for

---

Appellant. Michael N. Chesney, Michael J. Frantz, FRANTZ
WARD, Cleveland, Ohio, for Appellee.

———————

## OPINION

———————

KENNEDY, Circuit Judge. Plaintiff Lee Brenneman
("plaintiff") filed suit against his former employer
MedCentral Health System ("defendant"), alleging disability
discrimination in violation of the federal Americans with
Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et. seq.*, and
the Ohio Revised Code § 4112.02 as well as a violation of the
federal Family and Medical Leave Act ("FMLA"), 29 U.S.C.
§§ 2601 *et seq.* [1] Plaintiff appeals the district court's award
of summary judgment in favor of defendant on these claims.
For the reasons explained below, we AFFIRM the district
court's grant of summary judgment to defendant.

## I. Background

The record reveals the following facts. Plaintiff Brenneman
worked in defendant MedCentral Health System's Pharmacy
Department for approximately twenty-seven years. Although
he began his employment in 1973 as a Pharmacy Helper, he
received a promotion to Pharmacy Technician in 1975.
Plaintiff remained in this position throughout the rest of his
employment. Plaintiff was diagnosed with diabetes mellitus

---

[1] Plaintiff also alleged state-law claims of promissory estoppel,
intentional infliction of emotional distress, and wrongful discharge
contrary to public policy, on which the district court, in a single order,
also awarded defendant summary judgment. While plaintiff, per his
notice of appeal, purports to appeal the district court's entire summary
judgment order, plaintiff has presented no argument on these state-law
claims in his briefs and, thus, has failed to preserve such claims for
appeal. *See Sommer v. Davis*, 317 F.3d 686, 691 (6th Cir. 2003) (holding
that the appellants abandoned an issue for purposes of appeal where they
failed to argue it in their briefs).

in 1968. Although he sometimes has episodes of hypoglycemia, in which he can experience seizures, shock, and/or lightheadedness and incoherence, plaintiff generally controls his condition with insulin. Plaintiff also controls his diabetes by regulating his diet, exercising, and monitoring his blood sugar level throughout the day using a glucometer. Since 1998, plaintiff, whose diabetes has worsened with age, has used an insulin pump to control this condition.

During the course of his employment, plaintiff had substantial attendance deficiencies. According to his employment records, plaintiff had 193 unapproved absences and 34 late arrivals or early departures during his employment. These attendance deficiencies chiefly related to medical problems other than plaintiff's diabetes, such as six work-related injuries and other general illnesses. Defendant granted plaintiff FMLA leave on five occasions, none of which was for diabetes. Per its attendance policy, defendant disciplined plaintiff numerous times for his attendance problems. For example, plaintiff received a number of verbal and written warnings and suspensions. Although each disciplinary form affords the employee an opportunity to respond to the disciplinary action, plaintiff never once protested the imposition of discipline or mentioned his diabetes.

On March 31, 2000, plaintiff informed defendant that he "wasn't doing well and . . . wouldn't be in" that day. At that time, he did not mention that his absence was in any way related to his diabetic condition. On April 4, 2000, plaintiff met with his supervisors, Thomas Arkwright ("Arkwright"), the Director of Pharmacy Services, and Brian George ("George"), the Assistant Director of Pharmacy Services, regarding his attendance deficiencies. During this meeting, however, plaintiff never referenced his diabetes as the reason for his latest absence. Under defendant's attendance policy, this absence triggered another suspension of plaintiff. Moreover, pursuant to that policy, this suspension triggered plaintiff's termination because it was his third attendance-

related suspension within five years. Thus, at the conclusion of the meeting, plaintiff was terminated.

On April 6, 2000, plaintiff requested and attended a final exit interview with Bruce Engle ("Engle"), defendant's Vice President of Human Resources. Plaintiff, for the first time, mentioned that his March 31st absence was due to his diabetes. Specifically, plaintiff presented a note from Dr. Cynthia Dorsey, his diabetes specialist, stating that the absence was due to an extended episode of diabetes-related hypoglycemia. Defendant, nevertheless, finalized plaintiff's termination.[2]

---

[2] Defendant contends that plaintiff's apparent dishonesty during this exit interview afforded an additional ground upon which to terminate plaintiff, pursuant to its general disciplinary policy. Twice during the meeting, Engle asked plaintiff what he had done on March 31st, the day of his final absence. Twice plaintiff answered that he had been sick and had remained at home in bed all day. Engle, however, had learned that plaintiff had seen his workers' compensation doctor on that same day for non-diabetes-related reasons. When Engle confronted plaintiff with this information, plaintiff admitted that he had not, in fact, spent the entire day in bed. Plaintiff told Engle that he had simply forgotten about the appointment. Plaintiff testified that he had sufficiently recovered from his alleged hypoglycemic attack to drive himself approximately thirty-six miles round-trip to his workers' compensation doctor's appointment at 10:30 a.m. Plaintiff further testified that he was, nevertheless, not well enough to return to work. Defendant concedes, however, that this apparent misrepresentation by plaintiff was not a factor in its decision to terminate plaintiff; rather, according to defendant, it terminated plaintiff pursuant to its attendance policy. Thus, while this post hoc, additional ground for plaintiff's termination may be relevant to the calculation of any damages, it is irrelevant to the determination of whether defendant improperly terminated plaintiff under the ADA or the FMLA in the first instance. *See McKennon v. Nashville Banner Publ'g Co.,* 513 U.S. 352, 361-62 (1995) (explaining that, when an employer discovers an employee's wrongdoing after improperly terminating the employee on other grounds, "as a general rule . . . neither reinstatement nor front pay is an appropriate remedy . . . . The beginning point in the . . . formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date [that] the new information was discovered").

## II. Analysis

We review the district court's order granting summary judgment *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one "that might affect the outcome of the suit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A "genuine" issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 255. We must accept the non-moving party's evidence, and draw all justifiable inferences in his favor. *Id.* "We may affirm a decision of the district court if correct for any reason, including one not considered below." *See United States Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 330 F.3d 747, 750 (6th Cir. 2003).

### A. Disability Discrimination

The ADA proscribes discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. Under the ADA, an employer's denial of employment opportunities to an employee with a disability may constitute such unlawful discrimination if the denial is based upon the employer's need "to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112 (b)(5)(B) (1991). To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that: "(1) he is disabled; (2) he is otherwise qualified for the position with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) his employer knew or had reason to know of his disability; and (5) his

position remained open." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 449 (6th Cir. 1999). Once a plaintiff establishes a *prima facie* case of disability discrimination, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action against plaintiff. *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 520-21 (6th Cir. 1998) Once the employer discharges this burden of production, the employee must demonstrate that the proffered reason was, in fact, a pretext for unlawful disability discrimination. *Id.* at 521. The plaintiff always retains the ultimate burden of persuasion. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 936 (6th Cir. 2000).

Because neither party has argued that an action for handicap discrimination under Ohio law entails a different legal analysis than that for disability discrimination under the ADA, and because Ohio case law tends to suggest that it entails the same legal analysis as that under the ADA, we will analyze plaintiff's state and federal discrimination claims under Ohio Revised Code § 4112 and the ADA, respectively, solely under the ADA. *See Plant*, 212 F.3d at 938-39 (noting that Ohio case law seems to support the proposition that the ADA analysis applies to a Ohio claim of disability discrimination, and assuming so for purposes of its analysis because the parties have not argued otherwise); *Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 n.2 (6th Cir. 2000) (holding that "[b]oth federal and Ohio disability discrimination actions require the same analysis"); *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998) (holding that, to establish a *prima facie* case of handicap discrimination under Ohio law, which is "similar" to the ADA, a plaintiff must show that: 1) he was handicapped; 2) the employer took an adverse action against him, at least in part, because of his handicap; and 3) the plaintiff, "though handicapped, can safely and substantially perform the essential functions of the job in question," and noting that Ohio courts may look to the ADA for guidance in the interpretation of Ohio law). *But see Wooten v. City of Columbus*, 632 N.E.2d 605, 611 (Ohio Ct.

App. 1993) (holding that Ohio disability discrimination law is "at least as broad, *if not broader*, in scope than" the ADA) (emphasis added).

The district court granted summary judgment for defendant on plaintiff's state and federal disability discrimination claims on the ground that plaintiff had failed to establish a *prima facie* case of such discrimination; specifically, the district court held that plaintiff was unqualified due to his inability to satisfy defendant's basic attendance requirements.[3] We agree with the district court that plaintiff, as a matter of law, has failed to establish that he was otherwise qualified for the position of Pharmacy Technician with or without reasonable accommodation. Plaintiff's disability discrimination claims hinge upon defendant's failure to grant plaintiff the reasonable accommodation of FMLA leave for his diabetes-related absences and defendant's ultimate termination of plaintiff under its attendance policy based upon its assessment of points for these diabetes-related absences.

However, even if defendant had granted plaintiff medical leave for those absences which plaintiff specifically alleges were diabetes-related–absences on February 16, 1996; February 9, 1999; and March 31, 2000–,[4] plaintiff, as a matter

------

[3] As to plaintiff's failure to establish a *prima facie* case, the district court also held that plaintiff could not base his disability discrimination claim on any alleged refusal by defendant to accommodate plaintiff by granting him leave for his diabetes because plaintiff had *never* requested any such accommodation from defendant. The district court also granted summary judgment for defendant on the alternative ground that, even if plaintiff were to have established a *prima facie* case of disability discrimination, he, nevertheless, failed to demonstrate that defendant's proffered legitimate reasons for plaintiff's termination were a pretext for disability discrimination.

[4] Although plaintiff argues that he should have received medical leave for certain other diabetes-related absences, absences for which he simply informed defendant that he was "ill" or "not feeling well," we decline to consider these absences in our analysis since, as a matter of law, they do

of law, would not have been qualified to perform the essential functions of the Pharmacy Technician position due to his excessive absenteeism. *See Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1047 (6th Cir. 1998) ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA."); *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 781-82 (6th Cir. 1998) (holding that medical leave may be a reasonable accommodation under the ADA, there is no presumption that uninterrupted attendance is an essential job requirement, and that the employer must demonstrate that such leave would be unreasonable and impose an undue burden upon it, but noting that the plaintiff, nevertheless, bears the burden of proving that she was qualified for the position with such accommodation); *Hayes v. Cleveland Pneumatic Co.*, 634 N.E.2d 228, 232 (Ohio Ct. App. 1993) (holding that plaintiff, for purposes of his Ohio handicap discrimination claim, failed as a matter of law to demonstrate that he was capable of performing one of the essential functions of his job–regular attendance–due to his excessive absenteeism). The district court found that, based upon George's affidavit and its supporting documentation, plaintiff had been absent 193 times and had arrived late or left early on 34 occasions within the five years preceding his termination. Plaintiff claims that the payroll and clocking reports attached to George's affidavit are not the documents upon which George relied in calculating plaintiff's attendance points. Rather, according to plaintiff, George calculated the attendance points based upon a four-page spreadsheet, which plaintiff presented him with and questioned him about during

------

not constitute a request for leave as an accommodation for his diabetes. While plaintiff claimed that he would often relay this explanation when he was experiencing diabetes-related illnesses, this statement would not have reasonably apprised defendant that the absences were related to a disability rather than some general illness. *See Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1046-47 (6th Cir. 1998) ("The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation.").

his deposition. Moreover, plaintiff underscores that George, during his deposition, counted only five and one-third attendance points from that spreadsheet–an amount insufficient for defendant's entrance into the new attendance point system, under which defendant was ultimately terminated.[5] However, George testified that the referenced spreadsheet was a document that he had prepared for an unemployment compensation hearing *after* plaintiff's termination. George further testified that he would not have used this spreadsheet in calculating plaintiff's attendance points, and that he had used other documents, such as point reports and call-off sheets, that were not before him during his deposition. Thus, plaintiff, in attempting to manufacture a genuine issue of material fact, misconstrued George's testimony; George never testified–nor does any record evidence show–that he relied on this spreadsheet in calculating plaintiff's attendance points. Alternatively, plaintiff argues that a document entitled "Leave of Absence History," which provides that plaintiff, since 1995, had 43 absences from non-work-related injuries and 66 absences from work-related injuries, refutes defendant's contention that plaintiff had 227 absences. However, as defendant points out,

this document details only plaintiff's absences for which defendant granted him formal leaves of absence. In any event, plaintiff seems to concede that he has been absent on 109 occasions since 1995.

According to Arkwright's affidavit, regular attendance is an essential function of the Pharmacy Technician position, which entails preparing and delivering medications to hospital patients, ordering, receiving, and stocking medications, and posting charges to patients' accounts. Clearly, plaintiff could not perform these duties when absent from defendant's premises. Arkwright further testified that plaintiff's excessive absences placed a great strain on the Pharmacy Department. Specifically each time plaintiff was absent, Arkwright would have to either call in an unscheduled employee to cover plaintiff's shift or else reassign plaintiff's duties to employees who were already scheduled to work. Consequently, according to Arkwright, plaintiff's excessive absenteeism increased both employees' workloads and the department's pay-roll expenses and decreased the Pharmacy Department's morale. While Arkwright tried to carry a number of pharmacy employees whom he could call-in to work at a moment's notice to cover for an absent technician, it does not follow, as plaintiff contends, that plaintiff's absences did not prejudice defendant whatsoever. Arkwright's testimony shows otherwise. In sum, plaintiff, as a matter of law, has failed to demonstrate that he was qualified to perform the essential functions of the Pharmacy Technician position, even if he had received medical leave as a reasonable accommodation for his diabetes; rather, the record is replete with evidence of plaintiff's excessive absenteeism, which rendered him unqualified for that position.[6] Thus, the district

---

[5]Plaintiff argues that defendant's attendance policy was neither uniform nor uniformly applied because each department had it own attendance guidelines. Beth Hildreth ("Hildreth"), defendant's Human Resources Manager, testified that each department, including the Pharmacy Department, had its own attendance guidelines and that these could deviate as to the threshold that the employees must pass to enter into the system-wide attendance point system. However, Hildreth testified that the system-wide attendance point system uniformly applied to each employee who entered that system. Defendant has provided evidence of three, non-disabled employees in the Nursing Department whom it terminated for excessive absenteeism under its new attendance point system. Plaintiff does not dispute this evidence. Rather, plaintiff seems to argue that his accumulation of seven and one-third points so as to enter the attendance point system in the first instance was pursuant to a non-uniformly applied attendance policy. Because plaintiff has offered neither evidence of nor any meaningful argument on the alleged disparate application of the Pharmacy Department's attendance guidelines, we decline to consider such an argument.

[6]In so holding, we need not and do not express any opinion upon whether plaintiff has satisfied the other elements of a *prima facie* claim of disability discrimination or whether he has sufficiently demonstrated that defendant's proffered non-discriminatory reasons are pretexts for disability discrimination.

court properly granted defendant summary judgment on plaintiff's disability discrimination claims under the ADA and Ohio law.

## B. FMLA Violation

The FMLA affords an eligible employee up to twelve weeks of leave within a twelve month period when the employee suffers from "a serious health condition that makes the employee unable to perform the functions of . . . [his] position," among other qualifying reasons. 29 U.S.C. § 2612(a)(1)(D). The term "serious health condition" signifies "an illness, injury, impairment, or physical or mental condition that involves . . . (A) inpatient care in a hospital, hospice, or residential medical care facility or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11); *see* 29 C.F.R. § 825.114 (defining "inpatient care in a hospital, hospice, or residential medical care facility" and "continuing treatment by a health care provider"). 29 C.F.R. § 825.114(a)(2)(iii) provides that a "serious health condition involving continuing treatment by a health care provider includes . . . [a]ny period of incapacity or treatment for such incapacity due to a chronic serious health condition." It further defines a "chronic serious health condition [a]s one which: (A) Requires periodic visits for treatment by a health care provider . . . ; (B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, *diabetes*, epilepsy, etc.)." *Id.* (emphasis added).

To invoke the FMLA's protection for this qualifying reason, the eligible employee, during his employment, must request leave and give the employer notice that he is requesting such leave for a serious health condition that renders him unable to perform his position's duties. *See Brohm,* 149 F.3d at 523 (holding that, because the FMLA requires the eligible "*employee* . . . [to] provide notice and a qualifying reason for requesting the leave," the plaintiff's

FMLA claim cannot lie where he requested medical leave and received medical attention for his serious health condition only after the termination of his employment); *Hammon,* 165 F.3d at 451 (holding that a FMLA claim does not lie where the plaintiff failed to notify his employer of his qualifying condition and to request leave for such condition *during his employment*, but, rather, only did so after his employment had ended). However, the eligible employee need not expressly mention the FMLA as the source of his right to request such leave. *Hammon*, 165 F.3d at 451. Rather, the critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job. *Brohm*, 149 F.3d at 523; *Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713, 725 (6th Cir. 2003) (holding that the plaintiff, as a matter of law, had sufficiently notified his employer during his employment that his request for unforeseeable leave was for a FMLA-qualifying serious health condition when he informed his employer that he had been at the hospital and was unable to work due to an injury from a motorcycle accident).

The eligible employee must also give the employer this substantive notice within the requisite time frame. When the eligible employee's leave for his serious health condition is foreseeable based upon planned medical treatment, he must "provide the employer with not less than 30 days' notice, before the date the leave is to begin." *See* 29 U.S.C. § 2612(e)(2)(B) (excluding a situation in which "the date of treatment requires leave to begin in less than 30 days" and requiring the eligible employee, in such a situation, to "provide such notice as is practicable"). In contrast, when the approximate time of the needed leave is unforeseeable, the eligible employee should give the employer notice of the need for the leave "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). "It is expected that an employee will give notice to the employer within no more than one or two workings days of

learning of the need for leave, except in extraordinary circumstances . . . [in which] such notice is not feasible." *Id.*

Once an employer receives sufficient notice that the eligible employee is requesting leave for a FMLA-qualifying reason, the employer bears the burden to gather any additional information necessary for the leave to fall within the FMLA. *Hammon*, 165 F.3d at 450. An employer may require the eligible employee to provide, in a timely manner, certification by a health care provider. 29 U.S.C. § 2613(a). Where the leave is due to a serious health condition of the employee that prevents him from performing his job, the requested certification is sufficient if it states the date upon which the serious health condition began, the condition's probable duration, the appropriate medical facts regarding the condition within the health care provider's knowledge, and a statement that the employee is unable to perform his position's duties. 29 U.S.C. § 2613(b).

The FMLA renders it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right" that it affords. 29 U.S.C. § 2615(a)(1). Furthermore, any violation of the FMLA–or of the regulations implementing it–constitutes such unlawful interference. 29 C.F.R. § 825.220(b) (referencing an employer's refusal to authorize FMLA leave as an illustration of unlawful interference). The FMLA also renders it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the Act. For example, an employer may neither use an employee's "taking of FMLA leave as a negative factor in [an] employment action[]" against that employee nor count an employee's FMLA leave under its "no fault" attendance policies. 29 C.F.R. § 825.220(c).

Plaintiff's complaint alleges that defendant unlawfully interfered with plaintiff's exercise of his rights under the FMLA by counting various absences that he alleges were FMLA-qualifying–absences on February 16, 1996;

February 9, 1999; and March 31, 2000–under its "no-fault" attendance policy and by subsequently terminating plaintiff pursuant to that policy. The district court granted summary judgment to defendant on plaintiff's FMLA claim on the ground that plaintiff, as a matter of law, failed to give defendant sufficient notice of a FMLA-qualifying reason for these alleged diabetes-related absences.[7]

### 1. March 31, 2000, Absence

On appeal, plaintiff contends that the district court erred in granting defendant summary judgment because plaintiff had timely and sufficiently notified defendant of his need for FMLA leave for his absence on Friday, March 31, 2000, the latest absence triggering his termination under defendant's

[7]Before the district court, defendant argued that any FMLA claim based upon plaintiff's absences on February 16, 1996, and February 9, 1999, was time-barred because plaintiff had received suspensions based upon these absences and that these material adverse actions fell outside of the applicable statute-of-limitations period. *See* 29 U.S.C. § 2617(c)(1) and (2) (stating that an action may be brought under the FMLA "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought[,]" except that an action for a willful violation may be brought within 3 years after such time); *Butler v. Owens-Brockway Plastic Prod.*, 199 F.3d 314, 317 (6th Cir. 2000) (holding that a plaintiff's termination claim was not time-barred simply because it was based upon certain time-barred assessments of points for absences where the termination was the first material adverse action, and illustrating such a material adverse action with probation, termination, or a failure to reinstate). Plaintiff countered that the "continuing violations" theory applies so as to toll the statute of limitations here. *See Dixon v. Anderson*, 928 F.2d 212 (6th Cir. 1991). Defendant, in response, argued that there is no precedential support for the proposition that the "continuing violations" theory applies to the FMLA, as it does to anti-discrimination law. The district court did not expressly determine this statute-of-limitations issue when it held that plaintiff, as a matter of law, had failed to give defendant sufficient notice that his absences on February 16, 1996, and February 9, 1999, were FMLA-qualifying. In any event, defendant, by neither raising it nor presenting any argument on it in its brief, has abandoned the statute-of-limitations argument on appeal. *See Sommer v. Davis*, 317 F.3d 686, 691 (6th Cir. 2003).

attendance policy. On Friday, March 31st, plaintiff called defendant to inform it that he would not be at work. In particular, he stated that he "wasn't doing well and . . . wouldn't be in today." At that time, he did not mention that his absence was in any way related to his diabetic condition. Although plaintiff worked on Saturday and Sunday, April 1st and 2nd, respectively, he made no further mention of the reason for his one-day absence. On April 4th, his next scheduled day of work, plaintiff met with supervisors Arkwright and George regarding his attendance deficiencies. During this meeting, however, plaintiff did not mention his diabetes as the reason for his latest absence.[8] Under defendant's attendance policy, this absence triggered both plaintiff's suspension and his termination because it was his third attendance-related suspension within five years. On April 5th, plaintiff's wife informed Engle that plaintiff had been absent on March 31st due to a hypoglycemic episode, and that she had attended to him all night due to that episode. On April 6, 2000, plaintiff requested and attended a meeting with Engle. Plaintiff, for the first time, mentioned that his March 31st absence was due to his diabetes. Specifically, plaintiff presented a note from Dr. Dorsey that stated that "severe hypoglycemia due to diabetes" caused the absence and that this absence was, thus, FMLA-qualifying.

The information that plaintiff gave defendant–via his wife's statement to Engle or Dr. Dorsey's note–may have been sufficient to convey to defendant that plaintiff's March 31st absence was due to a serious health condition that rendered

---

[8]Plaintiff argues that he did not mention his diabetes during the April 4th termination meeting because he was never asked why he had been absent on March 31st. However, this argument is not persuasive. Given that his supervisors were expressly terminating plaintiff based, in part, upon this absence, a reasonable person in plaintiff's position would have referenced the reason necessitating that absence in an attempt to avert the termination.

him unable to perform his job.[9] *See Brohm*, 149 F.3d at 523; 29 C.F.R. § 825.303(b) (noting that an employee's spokesperson, such as a spouse, may give the employer the required notice if "the employee is unable to do so personally"). However, plaintiff, as a matter of law, failed to give defendant notice, even if it were substantively sufficient, within the necessary time frame for unforeseeable leave.[10]

---

[9]Plaintiff also argues that a genuine issue of material fact exists as to whether he had given defendant sufficient notice when he called in on March 31st and simply stated that he "wasn't doing well and . . . wouldn't be in today." In support, plaintiff relies on *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847 (8th Cir. 2002). In *Spangler*, the Eighth Circuit held that a genuine issue of material fact regarding notice existed because the defendant employer knew that the plaintiff suffered from depression, that she had needed FMLA leave for depression in the past, and knew that her latest absence was from "depression again." *Id.* at 852-53. Here, plaintiff argues that defendant knew that plaintiff has diabetes and that plaintiff had FMLA-qualifying, diabetes-related absences on February 16, 1996, and February 9, 1999–absences for which plaintiff contends defendant unlawfully penalized him. Unlike in *Spangler,* however, plaintiff did not advise defendant that his March 31st absence was related to a serious health condition–here, diabetes. Moreover, plaintiff's bare statement that he was unwell would not have reasonably apprised defendant that his absence was FMLA-qualifying, given plaintiff's long history of diverse physical maladies, both work-related and non-work-related. Likewise, plaintiff's assertion that he would habitually state only that he was "ill" or "not feeling well" when he was experiencing a diabetes-related illness is unpersuasive. Thus, even if plaintiff's assertions were true–that defendant knew of plaintiff's diabetes and his past need for FMLA leave for diabetes-related absences–, they are insufficient to create a genuine issue of material fact as to whether plaintiff's "call-in" gave defendant sufficient notice that his March 31st absence was FMLA-qualifying.

[10]To the extent that defendant argues that his notice was temporally sufficient because he met the time requirement for providing the employer–upon its request–of medical certification to support *a FMLA-qualifying request for leave*, such an argument is misplaced. *See* 29 U.S.C. § 2613; 29 C.F.R. § 825.311(b). Rather, the issue is whether plaintiff provided defendant with sufficient notice that his request for leave was for a FMLA-qualifying condition in the first instance.

First, plaintiff failed to give defendant notice "within no more than one or two workings days of learning of the need for leave." 29 C.F.R. § 825.303(a). Defendant did not receive notice from either plaintiff's wife or Dr. Dorsey's letter on or before April 2nd, the second working day after plaintiff learned of the need for the March 31st absence. Plaintiff argues that, although he worked on April 1st and 2nd, he was not required to give notice on or before April 2nd because Saturday and Sunday, the 1st and 2nd of April respectively, are not normal working days for physicians. However, the applicable regulation imposes no qualification that only the normal working days of physicians be counted in determining the timeliness of an employee's notice. *See id.* To the extent that plaintiff is implying that he needed to see Dr. Dorsey to be able to give defendant the required substantive notice, we fail to see how Dr. Dorsey possessed any more information pertaining to whether plaintiff's March 31st absence was due to a serious health condition rendering him unable to work than what plaintiff himself possessed.[11] While Dr. Dorsey may have informed plaintiff that the FMLA might cover the absence and provided medical certification to support any such claim, plaintiff need not have specifically mentioned the FMLA nor provided medical certification to meet his initial burden of giving defendant the requisite notice. *See Hammon*, 165 F.3d at 451; 29 U.S.C. § 2613; 29 C.F.R. § 825.311(b).

In addition, no extraordinary circumstances existed to render it unfeasible for plaintiff to have given defendant the necessary notice on or before April 2, 2000, the second working day following plaintiff's March 31st absence. *See* 29 C.F.R. § 825.303(a). Plaintiff seems to argue that, because of

---

[11] In fact, plaintiff testified that he neither spoke with nor saw Dr. Dorsey on March 31, 2000, for his diabetic condition. Rather, plaintiff first saw Dr. Dorsey regarding his March 31st hypoglycemic episode on April 5th, and Dr. Dorsey's letter was based upon a reading of plaintiff's blood glucometer from the day of the absence.

the physical effects of his hypoglycemic episode, he was physically unable to inform defendant that his March 31st absence was due to that diabetes-related illness. In support, plaintiff relies upon Dr. Dorsey's letter. In that letter, Dr. Dorsey stated that she believed that plaintiff had been unable to explain or to recognize that he was suffering from "severe hypoglycemia due to diabetes" when he called in on March 31st to report his absence because he had suffered from an extended period of hypoglycemia, which often causes "prolonged physical symptoms, including headache, difficulty thinking and concentrating, and hypothermia." However, plaintiff testified that he had "stabilized and everything was fine" by the time that he had returned to work on April 1st. Thus, plaintiff was physically able to give defendant sufficient notice on or before April 2nd, even if he were physically unable to do so on March 31st.

Plaintiff also argues that, even though defendant knew or had reason to know that he was a diabetic, defendant failed to advise him that the FMLA could cover diabetes-related absences, even those involving only episodic incapacity. Plaintiff testified that he would often report a diabetes-related absence by merely stating that he was "not doing well" and without expressly mentioning his diabetes because defendant had never informed him that the FMLA could cover such an absence. Plaintiff further testified that he did not think that mentioning the diabetes-related cause of the March 31st absence would have made any difference because he had received attendance points for previous absences that he had advised defendant were diabetes-related. Thus, plaintiff argues that, due to defendant's alleged failure to inform plaintiff that the FMLA covered diabetes and permitted intermittent leave for such a condition, plaintiff gave defendant the requisite notice "as soon as [was] practicable under the facts and circumstances." For example, plaintiff testified that he attempted to get medical certification from Dr. Dorsey for his March 31st absence only after he learned from his wife, on April 5th, that the FMLA could have covered his diabetes-related absences. According to

plaintiff's wife, after she told Engle, on April 5th, that plaintiff's March 31st absence was due to his diabetes, Engle informed her that plaintiff could have taken all of his diabetes-related absences under the FMLA. However, as the record makes clear and as he acknowledged in his deposition, plaintiff, over the course of his employment, received several informational notices from defendant specifying that the FMLA may cover diabetes as a chronic health condition, whether for episodic or continuing incapacity. Plaintiff testified that he cannot recall ever reading any of these notices, that he might have read through one of them "real quickly," and that, even if he had read one of them, he would not have noticed that it mentioned diabetes. Plaintiff underscored that no one ever "told" him about the FMLA's coverage of diabetes. However, plaintiff's lack of notice, if any, concerning the FMLA's coverage of diabetes stems from his own willful ignorance, not from any culpability on defendant's part. The FMLA does not require defendant to foresee that plaintiff would not have read the many notices that it had sent regarding the FMLA's coverage and, thus, either to force plaintiff to read those notices or to convey their content to him verbally. Contrary to plaintiff's assertion, his alleged lack of notice concerning the FMLA's coverage of diabetes does not absolve him of his failure to advise defendant that his March 31st absence was diabetes-related on or before April 2, 2000. In sum, we find that plaintiff failed to give defendant the requisite notice that his March 31st absence was FMLA-qualifying in a timely fashion.[12]

---

[12]First, in so holding, we need not and do not express any opinion upon whether plaintiff was an "eligible employee" for purposes of the FMLA after his termination on April 4, 2000. Plaintiff contends that genuine issues of material fact exist as to whether: 1) his discharge was delayed pending a grievance process, which ended in June of 2000; 2) whether his employment relationship continued for purposes of FMLA eligibility during that grievance; and 3) whether plaintiff gave sufficient notice for his March 31, 2000, absence during his employment relationship. *See Biermann v. Aluminum Co. of Am.*, No. 3-98-CV-20159, 2000 WL 33362002, at *8 (S.D. Iowa Jan. 21, 2000) (finding a genuine

## 2. Other Alleged Diabetes-Related Absences

The thrust of plaintiff's FMLA claim, per his complaint, is that defendant unlawfully interfered with the exercise of his FMLA rights by counting various absences that he alleges to have been FMLA-qualifying under its "no-fault" attendance policy and by subsequently terminating plaintiff pursuant to that policy. Plaintiff can point to only two instances in which he received attendance points for absences that he allegedly,

---

issue of material fact over whether the plaintiff's discharge "was delayed pending resolution of the grievance [process] under the CBA, and thus whether the employer-employee relationship continued for purposes of FMLA eligibility during the grievance process). Plaintiff also argues that his termination was not yet final on April 4th because, according to Hilbreth, she and Engle retained authority to halt the termination. Because we hold, however, that no reasonable jury could find that plaintiff was not required to give the requisite notice on or before April 2, 2000, and that plaintiff, in fact, gave the necessary notice within this time frame, any issues of fact concerning any notice after April 4th are immaterial.

Second, we reject plaintiff's argument that a genuine issue of material fact exists as to whether plaintiff had accumulated enough points to warrant termination. As of December 19, 1999, plaintiff had accumulated seven and one-third attendance points under the old attendance policy. According to the new attendance policy, plaintiff's seven and one-third points converted into two and one-third points. Plaintiff's March 31, 2000, absence resulted in the accumulation of another point, raising his total points to three and one-third and triggering a suspension upon the accumulation of the third point. Plaintiff argues that a genuine issue of material fact exists as to how he received seven and one-third attendance points under the old attendance policy because George, during his deposition, could count only five and one-third points–a number insufficient for entrance into the new point system–based upon a spreadsheet that plaintiff gave him. However, as previously discussed, because plaintiff's contention relies upon a misconstruction of George's testimony, plaintiff's attempt to manufacture a genuine issue of material fact must fail.

expressly informed defendant were diabetes-related–his absences on February 16, 1996, and February 9, 1999.[13]

As to the first instance, plaintiff testified that, on February 16, 1996, he had informed one of the pharmacists that he was "running late" for work because his "[b]lood sugar [was] acting up." An Early Leave/Late arrival form documents this. He testified that, when he came into work on that day, he told an assistant manager that he was having problems with his blood sugar, and that he would have to see a doctor.[14] A "call-off" form documents that the reason for plaintiff's absence was because his "[b]lood sugar was messed up." Due to this illness, plaintiff missed work from February 16, 1996, through February 20, 1996, with the exception of February 19, 2000, on which plaintiff was not scheduled to work. Plaintiff returned to work on February 21, 1996, the day of his next scheduled shift. After returning to work, plaintiff submitted a note from Dr. Roemer, his family practitioner, dated February 19, 1996, that stated that plaintiff's absence from February 16th through

---

[13]Although plaintiff contends that he also improperly accumulated points based upon certain absences due to workers' compensation injuries, we decline to consider this contention because plaintiff has presented no argument as to how these absences relate to and fall under the FMLA. *See Sommer,* 317 F.3d at 691.

[14]Plaintiff also testified that he went to see Dr. Roemer on that day, February 16th, and that he was sure that Dr. Roemer would have given him a medical note for defendant. However, as discussed below, Dr. Roemer's note is dated February 19th, the date which the FMLA form states that Dr. Roemer saw plaintiff. Moreover, a "call-off" sheet on February 19th–for his February 20th absence–states that plaintiff had gone to a doctor on the 19th.

---

February 20th was from the "intestinal flu"; it made no mention of plaintiff's diabetic condition.[15] Plaintiff testified that Carol Blackstone ("Blackstone"), defendant's Benefits Manager, told plaintiff that he should try to have the FMLA cover the absence, and gave him an FMLA form for his doctor to fill out.[16] Plaintiff further testified that he followed Blackstone's suggestion even though it confused him because he did not know that the FMLA covered the flu. Plaintiff later submitted an FMLA certification form, signed by Dr. Roemer and dated February 22, 1996, that stated that plaintiff's absence was due to "gastroenteritis" and that he saw plaintiff on February 19, 1996. Defendant denied plaintiff's FMLA certification request on the ground that plaintiff's "gastroenteritis" did not constitute a "serious health condition" under the FMLA.

Even if plaintiff had given defendant timely and sufficient notice that his February 16, 1996, absence was diabetes-related and, thus, FMLA-qualifying, plaintiff, as a matter of law, failed to give defendant, upon its request, medical certification that confirmed that this absence was, in fact, caused by plaintiff's diabetes–the condition for which plaintiff would have given defendant the proper notice.[17] *See*

---

[15]Under defendant's applicable attendance policy, plaintiff, by providing this doctor's note, received only one attendance point for these absences, which spanned four consecutive shifts.

[16]Blackstone testified that, when she would learn that an employee had been ill for three days and had received medical treatment for the flu, she would always request medical certification in such a situation because the employee could have mis-communicated or misunderstood his true illness.

[17]We reject plaintiff's alternative theory that this absence was FMLA-qualifying because it involved incapacity for more than three calendar days and plaintiff received treatment from a healthcare provider. *See* C.F.R. § 825.114(a)(2). As evidence, plaintiff points to Dr. Roemer's note stating that plaintiff's absence from February 16th through the 20th was due to the intestinal flu and the FMLA certification form stating that

29 U.S.C. § 2613(b). In requesting such certification, defendant discharged its duty in seeking any additional information necessary for the leave to fall within the FMLA. *See Hammon*, 165 F.3d at 450. Because the medical certification that plaintiff provided was insufficient on its face, the FMLA's provisions governing an employer's request for re-certification where it "has reason to *doubt* the validity of the certification" are inapposite. 29 U.S.C. § 2613(c) and (d) (emphasis added). Here, rather than doubting the certification's validity, defendant accepted the certification, including its representation that "gastroenteritis" caused plaintiff's February 16th absence. While plaintiff testified that he went to see Dr. Roemer, his family practitioner, rather

---

Dr. Roemer had seen plaintiff in his office on February 19, 1996. Thus, plaintiff's argument implicitly rests on the theory that the intestinal flu was a FMLA-qualifying serious health condition. To the extent that plaintiff has preserved this argument for appeal, it must, nevertheless, fail.

To constitute a "serious health condition," the condition must involve–along with at least a three-day period of incapacity–treatment for that condition by a health care provider either two or more times or at least once as long as it results in a regimen of continuing treatment under that provider's supervision. 29 C.F.R. § 825.114(a)(2)(i)(A) and (B). Because plaintiff's February 19th visit to Dr. Roemer upon which he relies constituted only one instance of treatment, plaintiff must also demonstrate that this visit involved a regimen of continuing treatment under Dr. Roemer's supervision. While plaintiff testified that Dr. Roemer had prescribed him medication for the intestinal flu, the very FMLA certification document that plaintiff points to as evidence states that the treatment regimen involved only leave from work, rest, and fluids. Yet, as 29 C.F.R. § 825.114(b) makes clear, "bed-rest, drinking fluids, . . . and other similar activities that can be initiated without a visit to a health care provider . . . [are] [in]sufficient [by themselves] to constitute a regimen of continuing treatment." In addition, 29 C.F.R. § 825.114(c) states that, absent arising complications, the flu is generally not a FMLA-qualifying "serious health condition." While one could argue that plaintiff's diabetes was a condition complicating his flu, plaintiff testified that the only treatment that he received for that absence was from Dr. Roemer, who only treated him for the flu. Thus, such a dual-condition theory would fail for lack of the requisite medical treatment "relating to that same condition." 29 C.F.R. § 825.114(a)(2)(i).

---

than Dr. Dorsey, his diabetes specialist, because a lot of his illness had to do with the flu, and that the flu had been activating his diabetes, making it "go out of control at the time," there is no evidence that plaintiff relayed this information to defendant. The FMLA does not require an employer to be clairvoyant.[18]

Regarding the second instance, plaintiff testified that, on February 9, 1999, he had told one of his co-workers that he was leaving work early due to a problem with his insulin pump. An Early Leave/Late Arrival form states that plaintiff's early leave was due to a "problem with his insulin pump." Plaintiff neither saw a doctor nor provided a medical confirmation of this problem from a doctor. Plaintiff testified that, before work on February 9, 1999, his blood sugar was 361 and he was not feeling well. Plaintiff further testified that, although he gave himself a dose of insulin via his pump, his blood sugar spiked to 500 at work and he "was feeling really bad." According to plaintiff, he called Dr. Dorsey from work and she advised him to go home, disconnect the insulin pump, inject a dose of insulin with a needle to decrease his blood sugar, and then reinsert the insulin pump. Plaintiff testified that, while at home, it took approximately three to four hours before his blood sugar normalized. According to plaintiff, this hyperglycemic episode occurred because the insulin pump had become disconnected from his body, and he did not have to see a doctor because he fixed the problem with the pump.

As stated above, the critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious

---

[18]We note that the "call-off" sheets for February 17th and 20th of 1996, which report that plaintiff was "feeling out of sorts" and "ill," respectively, further demonstrate the expanse of generalized information that defendant had concerning the reason for plaintiff's absence.

health condition that rendered him unable to perform his job. *Brohm*, 149 F.3d at 523; *Cavin,* 346 F.3d at 725 (holding that the plaintiff, as a matter of law, had sufficiently notified his employer during his employment that his request for unforeseeable leave was for a FMLA-qualifying serious health condition when he informed his employer that he had been at the hospital and was unable to work due to an injury from a motorcycle accident). Here, the only way that plaintiff's problem with his insulin pump could constitute the requisite "serious health condition" is if it were "an illness, injury, impairment, or physical or mental condition that involves . . . [a]ny period of incapacity . . . due to a chronic serious health condition." 29 C.F.R. § 825.114(a)(2)(iii) (defining "a chronic serious health condition" as one that "(A) Requires periodic visits for treatment by a health care provider . . . ; (B) Continues over an extended period of time . . . ; and (C) May cause episodic rather than a continuing period of incapacity (e.g., . . . *diabetes* . . . )") (emphasis added). We assume *arguendo* that defendant had sufficient notice that plaintiff suffered from diabetes as a chronic health condition, and that defendant knew that plaintiff's diabetic condition caused him to use an insulin pump. While plaintiff testified at length about the physical effects that he experienced due to the insulin pump becoming disconnected from his body, plaintiff does not claim that he relayed this information to defendant.[19] Rather, according to plaintiff, he

---

[19]In fact, the only evidence in the record that suggests that plaintiff might have relayed this information to defendant is a sworn letter, dated May 24, 2000, by Paul Nunamaker ("Nunamaker"), the pharmacist to whom plaintiff reported his February 9, 1999, absence. In that letter, Nunamaker stated that he knew that plaintiff was having "problems with his blood sugar." However, Nunamaker also stated that he excused plaintiff from work because he believed that plaintiff "was a good judge of how serious the problem truly was." Even construing this letter in the light most favorable to plaintiff, plaintiff did not reasonably apprise defendant that the problem with his blood sugar incapacitated him or rendered him unable to perform his duties. As Nunamaker stated, he did not know "how serious the problem truly was," but, rather, relied on plaintiff to determine whether it warranted him leaving work early. Thus,

merely told defendant that he was having a problem with his insulin pump. This statement, as a matter of law, could not have reasonably apprised defendant that plaintiff's February 9, 1999, absence was due to a "serious health condition," as described above. It is insufficient to give rise to an inference that plaintiff was suffering from any physical impairment or illness or experiencing any period of incapacity. For all defendant knew, the "problem" with the insulin pump simply might have been of a mechanical or minor nature that would not have effected the pump's effectiveness or plaintiff's health. Perhaps, for example, the pump's battery was running low and simply needed to be changed. Similarly, plaintiff's mere statement that he was experiencing a problem with his insulin pump did not reasonably apprise defendant of a condition that rendered him unable to perform his duties. We find that plaintiff, as a matter of law, failed to give defendant sufficient notice that his February 9, 1999, absence was FMLA-qualifying.

## C. Plaintiff's Motion for Partial Summary Judgment

Plaintiff contends that the district court abused its discretion by failing to rule on plaintiff's motion for leave to file a motion for partial summary judgment on plaintiff's FMLA claim, which plaintiff had filed on October 30, 2001, before it granted defendant's motion for summary judgment, which defendant had previously filed on September 21, 2001. During a pre-trial conference, the district court ruled that it would hold plaintiff's motion in abeyance pending resolution of defendant's motion for summary judgment. According to defendant, plaintiff never objected to this ruling before the district court. On May 2, 2002, the district court granted defendant's motion for summary judgment on all of plaintiff's

---

for all Nunamaker or defendant knew, the problem with the insulin pump may simply have caused plaintiff to experience a minor fluctuation of his blood sugar, prompting plaintiff, out of an abundance of caution, to want to try to repair his insulin pump to avert any potential, substantial fluctuations of his blood sugar.

claims. Having already disposed of the entire case on its merits, the district court never expressly ruled upon plaintiff's motion for leave to file a partial summary judgment motion.

The district court did not err in adjudicating defendant's motion for summary judgment before plaintiff's motion for partial summary judgment. *See Kennedy v. City of Cleveland*, 797 F.2d 297, 305 (6th Cir. 1986) (recognizing the discretion of "the trial judge who is charged with the responsibility . . . [of] managing his docket and [e]nsuring an expeditious processing of the litigation"). This management of the motions was clearly reasonable given that defendant's motion was filed before plaintiff's motion and, importantly, that the resolution of defendant's motion could have disposed of the entire case–as it, in fact, did–while the resolution of plaintiff's motion would have disposed of only plaintiff's FMLA claim. Moreover, in granting defendant's motion for summary judgment, the district court expressly found that all of plaintiff's claims *failed* as a matter of law. Thus, the district court implicitly found that plaintiff's FMLA claim could not *succeed* as a matter of law, such as to warrant an award of partial summary judgment to plaintiff on this claim.

For the preceding reasons, we AFFIRM the district court's grant of summary judgment to defendant on plaintiff's federal and state claims alleging disability discrimination and his federal claim alleging a FMLA violation.